v. McClelland, Grant v. City of Houston, or McClelland v. Killian v. Killian v. McClelland. Romero v. Bexar City, Jones v. Lopez, Kincheloe v. Cottle, and Brown v. Muhlenberg Township. The video evidence alone, in the first 20 seconds, takes away the possibility of qualified immunity for Mr. Killian. We wanted to play that video as part of an oral argument, but we weren't able to arrange that. Don't worry, we have access to it. Perfect. As you've seen on the video, when Mr. Killian is on the front porch of the Ramirez residence, it's wind. You don't hear argument, you don't hear things being thrown around, you don't hear an argument escalating and then see Mr. Killian enter. Because that's what Mr. Killian wrote on his June 21, 2016 incident report, that he heard sounds of an argument escalating and then enter. That is contradicted by the video evidence, and Scott v. Harris controls, as does Poole, which is the case in this court, talking about Scott v. Harris. As Mr. Killian advances into the living room, still nothing. We see Ms. Ramirez, confused, doesn't look like she had just been in a fight, she doesn't have a red face, she's not breathing heavily. And he gives contradictory orders. Yes, Your Honor. He tells her to come here, come over here, get over here and face that wall. And you see on the video, she freezes. And as she starts to turn to face the wall, and as he's screaming, get over there and face that goddamn wall, bitch. He's already pepper spraying her in the face. A reasonable jury. She's supposed to be, what was the situation about whether she was the alleged victim of the domestic violence, the domestic disturbance call, did we not know? We didn't know what the situation was. All we know is that Mr. Killian says he was responding to a domestic violence situation. We would presume he's there to protect the person who's pepper spraying. The factual issue for the jury that was decided in the first part of the appeal, because there's two parts, there was the Rule 50 and the Rule 56, is whether Bruno, the dog that Mr. Killian shot and killed, posed an objective threat. The video alone was enough for the magistrate judge to determine that's a question for the jury. The video alone was enough for the district judge to determine that's a question for the jury. He did that both at summary judgment and at the Rule 50 rule. Then, when the jury decided that there was no objective threat posed by Bruno, 140 days later, the district court suddenly said that there is not sufficient evidence for the jury to have considered the question. But that is a change of the district court's opinion. He sent the case to the jury and he said, I'm denying the Rule 50 motion for the reason that I do think this case boils down to everything discussed in that document 60, which was his adopting a court recommendation. So do you see, should we reverse and render on that claim or what should happen? The Fifth Circuit should reverse and render on that claim and reinstate the jury's verdict. The reason being that the district court, in his judgment for a matter of law under Rule 50B, said that we did not present evidence as to what the prototypical reasonable officer would do. But as Judge Higginbotham said just about a month ago, there is no stand-alone objective reasonableness element to the Supreme Court's two-prong test for qualified immunity. That was in their Hicks v. LeBlanc decision. Because the district court expected us to present evidence as to an element that does not exist, that decision has to be reversed and that's why I think the verdict needs to be reinstated. As I understand it, but correct me if I'm wrong, so there are three issues before us. One is the entry into the residence, and number two is excessive force, and number three is the one the jury decided which was the property, the dog. Is that right? That is correct, Your Honor. I was just about to move to that. Those are all three before us and we can rule and should rule on all three, is that right? Yes, Your Honor. If there were no other questions as to the Rule 50 judgment, I'd like to move to the entry of excessive force. Okay. I just don't see where you have any kind of complaint at all about the entry. I mean, there was a call for domestic violence, and I don't think officers have to go get a warrant or knock politely for that kind of thing. They face that every day. I think that's the weakest part of your claim. I don't disagree that it is the weakest of the three. However, in this circumstance, and as acknowledged by the magistrate and district court, in a domestic violence call, and we did brief this, there's the possibility that there's dissipation between the time of the call and the officer's arrival. The reason why we brought this on appeal is because of the video and the discrepancy between the June 21, 2016 police report as compared to the video. It's not until February of 2019, over two years later, that Mr. Killian suddenly remembers that I didn't turn on my body cam, I had to leave the house, I turned it on, and it wasn't until the eve of the first trial, when we were trying to comply with the pretrial order to cut the video to a certain length, that we discovered there's a two-minute gap between the time that Officer Killian says, I hear somebody getting beat and going in the house and actually going in the house. That is discussed extensively within the context of the brief, and it breaks down the math and the timeline. So you're saying, is there case law that says that if a report has been made of domestic violence, but it's not loud or doesn't look like there's domestic violence when you arrive on the property, that you should instead knock and check on things? Is there some kind of case that would say he needed to do something different in that circumstance? Yes, there is case law, and that is there's three cases, I believe, that are discussed specifically in that context of the brief. I don't have them off the top of my head, though. Because there would be a fact issue on what was the circumstance when he arrived. Yes, exactly. Was the circumstance exigent when he arrived, but I don't know what the requirements are for what clearly established law is on that. Certainly. What are the three cases again? I don't have them off the top of my head, but I know that they were discussed in the report and recommendation when the report and recommendation said that dissipation can occur between the time of the call and the time of the officer's arrival. But in that case, the officer's not supposed to bust in? Yes, Your Honor. Those cases hold that as clearly established law? That is my understanding from the magistrate report and the research and writing that went into the brief, Your Honor. Okay. In the context of the dissipation and whether there was an exigency at the time of entry, that is still a question of fact for the jury for the credibility issues that I discussed earlier, but also because when you see Ms. Ramirez on the body cam, she does not look like she had just been in a domestic disturbance. But somebody could call in a wrong, incorrect thing. Somebody could call in the wrong, incorrect thing. It reminds me of the case Florida v. J.L. It's a Supreme Court case that says an anonymous report of some kind of crime going on isn't enough to give an officer probable cause to effectuate an arrest. There has to be an independent verification. Well, but he wasn't arresting. He was going to a scene of something unfolding. Correct. I'm analogizing that, Your Honor, in terms of what an anonymous report of some sort of crime allows an officer to do and doesn't allow an officer to do. But you know we don't. Analogies go very tightly in the qualified and immunity clearly established world. Understood, Your Honor. That case just popped in my head. I remember it from a criminal case I did a while back. As it relates to the excessive force. So one thing I want to ask you about the excessive force is, and correct me if I saw it wrong, but to me the video, he asked them more than once to get down or get down on the floor or whatever and they never did. Is that correct? What's the proper interpretation of whether they were complying with his orders? If you refer to, it's a record. This is my first appeal. I don't know how to properly say this and we're arguing, but record ROA 11060.496. That is the district court discussing that when they're told to get on the ground, there's partial compliance. Ms. Ramirez gets on her knees. I think that is a jury question as to whether she complied with that order. She did get to the ground. She got on her knees and she was pepper sprayed anyway. But more particularly. But then he kept telling her to get down even though she was on her knees. Isn't that right? He was screaming get down. Mr. Gonzalez did not go to his knees. He was specifically ordering Mr. Gonzalez to further get down. And as detailed in the magistrate's report and recommendation, because Mr. Gonzalez was not complying with orders, Ms. Ramirez was also getting pepper sprayed. I think under Hope versus Pelzar, you don't need a case on point to say pepper spraying somebody because somebody else isn't following your orders is unconstitutional. Was she getting pepper sprayed or was it just because she's in the proximity? The understanding that I have from the video, and I believe this is the understanding the magistrate had from the court, that she was getting pepper sprayed directly. They were pepper spraying the plaintiff's oral, is the way it reads in the magistrate court. And that is the way I see it on the video. What about the banging of the head? So that's the second part of the summary judgment excessive force issue. At the time of the head banging, what has happened since? Ms. Ramirez and Mr. Gonzalez allowed themselves to be handcuffed. Everything was calm. They're sitting on the couch, cuffed behind their back. Sheriff Riley, her precious aunt, has finally arrived. He has backup. There is dissipation of the earlier events. Ms. Ramirez sees the sheriff, Mr. Killian's boss, come into the living room. She stands up to greet him and then, grabbed by her hair and thrown to the ground. The question on excessive force is, could less force have been used? Could Mr. Killian have pushed her back onto the couch? Could Mr. Killian have told her to sit back down? Absolutely yes. But instead, he immediately escalates to grabbing her hair, throwing her to the ground, doing a takedown, so to speak. And a jury could reasonably determine that there would not have been a threat. There was no chance of escape, so forth and so on, because she's already handcuffed. She could have been pushed back to the couch. But the issue with that, it was in the magistrate court, it was in the district court, is that there was a factual finding made that she was told to stay seated. That is not on the video at all. She was never told to stay seated. She was sitting down, and when Sheriff Riley got to her home, she tried to stand up and then was thrown. It says I have two minutes left, but rather than talk and repeat things, I will, unless you have further questions. You've saved time for rebuttal. Thank you, Mr. Messner. Hi, police and court. I'm Matt Messner. I represent the attorney in this case. On Friday, I filed a 28-J letter brief. I wanted to make sure that the court was aware of that. It's bringing to the court's attention a Supreme Court case, which I think bears on one aspect of the appeal. This relates to everything on summary judgment. I think that based upon the recent, it was after briefing was completed, after that opinion came out. The Dupree case, is that? It's a Supreme Court case, Your Honor. It is Dupree versus Younger. That's 143 S Supreme Court. We have your letter here. Okay, you do have our letter. And, Your Honor, I would submit to the court that based upon that opinion, this court lacks jurisdiction to address the summary judgment issues, which are part of one of the aspects of the appeal, because at the conclusion, post-judgment, the appellants did not raise a Rule 50 motion, which is required. This is a completely different procedural posture. This is where the court denies summary judgment on sufficiency of the evidence, and that's not appealable unless the party preserves its sufficiency challenge by filing a post-trial motion. That's very different than the court's granting a summary judgment motion. You don't have to file a subsequent motion once the court has already granted summary judgment. Your case omits, your 28J omits multiple references to denials of summary judgment, and the rule of Ortiz would not cover situations where summary judgment is granted. Would you like to address that? Well, the opinion on Dupree was address an issue on a legal sufficiency. The denial of summary judgment on legal sufficiency. That's the opposite of when summary judgment has been granted. Once summary judgment is granted, you don't repeatedly bring motions when they've lost summary judgment. Well, and I may be incorrect, and the court can correct me on this, but my interpretation of this is because the court didn't issue a 54B separate judgment, that my reading of this is that in this situation, you did have to re-urge that through a Rule 50 motion before the appeal went through. If I'm incorrect on that, the court will correct me. Now, getting to the heart of the matter with respect, and I'm certain the court will correct me, but getting to the heart of the matter with respect to the summary judgment rulings, I want to point out a few things. When this domestic disturbance call came in, there was a report that Mr. Ramirez was getting beat up. The officer arrives on the scene. He didn't turn on his body. This is in the record. Didn't turn on his body camera when he first got there. He hears screaming, hears something banging, sounded like somebody was getting beat up. He starts to enter, then he realizes, I didn't turn on my body camera. He steps back out, turns his body camera back on. So from that point forward, what we've got is the video. So it's not a two-minute gap. It's just two minutes missing at the beginning. Is that right? There's two minutes between the time that he called, because we know the time of this because he called for backup. And so we've got in the record when the call came in. And so you've got that situation where this isn't a situation where Scott v. Harris applies because there's nothing to contradict the video because we don't have that on the video. Well, the video contradicts the idea that there is something going on in the house because it's so peaceful and quiet. And you can hear the wind blowing. And it's just you don't hear anything. So the video itself, couldn't a jury disbelieve the officer that he went out and in? Because that was a rather late addition to his testimony and wasn't in the reports when he was being investigated, all of that. Couldn't the jury disbelieve the officer? They could, but there's not anything in the record to show that the credibility of the officer was at issue. That was something that was raised. What do you mean not at issue? There was nothing raised, at least at the summary judgment level, to show the credibility of the officer was at issue. Well, that it's so quiet and peaceful when on the video that the people do not appear to have been in a type of scuffle and are calm and not, not panting. And there's no dishevelment or anything that would indicate that people had been in a fight, that nothing's thrown around the place when they arrive. None of the, so there the circumstantial evidence could, does a jury, could a reasonable jury believe that his testimony is contradicted by the circumstantial evidence and by the present, the video that is there? Respectfully, I'd have to disagree with that because the beating could have stopped. Assuming there was beating that was going on. It just wasn't picked up on the body camera. And so when he, when he, we don't know the situation, we don't fully know the situation. Assuming he was called to the house when they, because she is being beaten up. Why would you immediately scream at her when she startled, when someone's entering the house, it just with profanities forcing her against the wall, when she's the alleged domestic disturbance victim, as you just indicated, um, in your opening. Well, your honor, I believe the record is that sounded like somebody was getting beat. Not necessarily. You said, presumably miss Ramirez was getting beaten. You opened up with that in your own argument today. Yes, your honor. I said it, but I believe the record is that when the call came in that somebody was getting beat. So that was just an error that you made just a second ago. I'll concede that that is an error, but when somebody is coming in, there's coming into a tense situation. Anytime an officer gets to a, a domestic disturbance call, it's a tense, uncertain situation. We watch lots of these videos, right? This woman is just standing there looking perplexed. What are you doing in my house? And he's not, he's gone to, you know, Defcon, whatever the level, the high level, it's always different than what people say on Defcon, but, um, it's, it's high alert. Why is that? That he's screaming at her and getting her against the wall. And he's not trying to get the, perceive the facts. Your honor. All I can say is that, is that, is that officers, when they respond to a domestic disturbance call, it's uncertain. It's tense. Uncertain. The language is, is pretty rough language. We've seen many, many of these. We watch these videos monthly. Never seen anything like this. Well, simultaneously, he's shooting the dogs too. That's, that's quite an undertaking. Well, we have a situation, at least on the video, that we had a magistrate judge that made a ruling, uh, uh, with respect to the dogs. The district judge, when he looked at the FCR, said, well, the one dog, which was the German Shepherd, looked like it was coming in an aggressive manner and, and determined that that shooting was, was justified. But with respect to the pit bull, uh, the court said there was a question as to that. I saw that film, and I didn't, I saw no basis for shooting dogs. I'm sorry. That's, that's, that's, that's, uh, it, it's compelling. I don't, it doesn't admit a lot of other excuses. Um, one of the dogs got up and wagged his tail, and he, he, for that, he was shot. Uh, I, of course, an officer has to anticipate that, that if it's a dog, a dog comes after him, and he's, he's not engaged with a dog, not watching something else yet. But he came in shooting. As he, as he entered into the kitchen area to come out, that something was said in Spanish, uh, I believe, the record reflects. Maybe I misunderstood the, the, the, the film, but, uh, when I saw the film, it was, it was stunning. Uh, he just started shooting the dogs, according to the film, for no good reason. I mean, I, he called him a pit bull or whatever. He was wagging his tail, and, and it said he was shot. I mean, how do you, how do you defend that? Your Honor, the summary judgment evidence was that he perceived that he was in danger, uh, at that time. And so, I, I'm just going by, by what. The jury didn't agree with that. I'm sorry? The jury didn't, didn't agree with that. A jury, a jury, the case went to the trial, uh. Yeah. To, to the jury. And, which takes me to the, the second part of, of, of the appeal. And, the trial judge, no less than six times in this case, pointed out that because qualified immunity had been raised as a defense, that the. Look at the interrogatory submissions. Every element, uh, is put to that jury. Uh, the reasonableness, et cetera. It didn't take a Texas jury long to come back with a verdict and nail you for 200, what, $200,000 or something, uh, for that, uh, whatever the numbers were. I don't remember the numbers now, but they were large. Uh, the, which, and I can understand that because I think they were reacting to the same as I did, just looking at the film. Uh, is there any basis for defending that? Uh, from a legal standpoint, uh, our argument is that the, uh, the appellants did not question any of the officers about what a reasonable officer would do. They did, they had the burden on, on, uh, to overcome the affirmative defense. As this court knows, this is one of those unusual situations where the defendant raises qualified immunity as an affirmative defense. And then the plaintiff has the burden to, to overcome that. Well, why don't the film do that in a compelling fashion? Well, you, you've got to, you've got to write something out. Well, you've got to question the witnesses. You've got to question, uh, you've got to question, uh, there were three opportunities to, to do that. You, you, or you had an, could have had an expert. They didn't bring an expert. They didn't question, uh, Killian on that. They didn't question, uh, Sheriff Kent Riley on that. And the court pointed that out in, uh, in its, in its opinions and admonished the, uh, the plaintiffs that that was their burden as well. And so that seems to be confusing because their burden was to say that no reasonable officer would shoot the dog, uh, under the circumstances that, and that's clearly established. You know, when the dog is not posing any sort of threat, that is the law. And so the question for the jury was the correct one on the qualified immunity. And it's exactly on the pattern jury charge. And it's not at all. There's no extra other questions that they have to put evidence for on the qualified immunity. That's why the qualified immunity pattern jury charge is directed the way it is. So this idea that they also have to put on an expert that says, well, an officer arising at the scene should have done this with the dog and we'll put the chain on the dog or pepper sprayed the dog or done these five things with the dog. That's not anything in the requirements for qualified immunity. The question is, if a dog is not posing any sort of threat, what would a reasonable doc, uh, law enforcement do? And the jury had to, as part of the process, you had to decide whether that dog was being aggressive. And the video is evidence of that, of whether the dog's aggressive or not. And his testimony is also evidence. And the jury could believe the video or they could believe his testimony. We have to accept the video, even over evidence under Scott V. Harris, but the jury could believe the video or his testimony and they believe the video. I, I understand what you're saying, Your Honor. I, I'm in a position where I've got to argue that they needed to question. They didn't have to bring in an officer, but they needed to question the officers. You, you have to defend a district court interpretation, but that's what, that's what the district court submitted to the jury. Can you help us on the other points about the entry and then also about the excessive force, the, the, the qualified immunity parts of that. Your Honor, in our brief, we've pointed out that I think I've cited to at least three cases where a delay in entry, even if we get into this, the delay in entry doesn't exclude the exigent circumstances. Again, I think I've, I think I've touched on it, but I can get back into it. I think I've touched on the explaining the situation and the delay, the calling for backup. This officer was there by himself and didn't know what to expect when he went in there. So I, I think that we've covered the, the exigent circumstances, the pepper spraying. There was, that's a situation where he's, he's instructing them to get against the wall, giving them instructions. You've got Ms. Ramirez that's not complying throughout. She's saying, you're not going to handcuff her husband. Wasn't, wasn't he giving instructions that were somewhat contradictory? I'm not sure that there was one instruction that they would have understood is what they had to do. Well, he was giving different instructions based upon the different things he was seeing. And our position is that they weren't contradictory because it was a fast moving, changing situation. The, and so the, the, and you had Ms. Ramirez constantly telling the, the deputy that you're not going to handcuff Mr. Gonzalez. And so in that situation. And in fairness, she was threatening to sue him and she was, she was going to be in court about all of that. So I'm good. These are my words, but, but there, there was language to that effect. So she was not, especially being verbally cooperative. The vulgarities flowed both ways. And, and so I, I believe that the entry was, is justified. The pepper spraying, I believe is also justified, even when there were some different commands being given. You have a situation with the alleged head banging where you had a situation where Mr. Ramirez eventually, after constantly refusing commands, eventually it gets to a couch. I think during, during this specific time, Sheriff Riley enters the house. She starts to get up. So I, he ends up grabbing her by the hair. He denies that he did head banging, but grabs her by the hair to get her down. What does the video show on the head banging? Obscured? The, I think the body camera falls off. And so we don't, we don't have a clear, a clear view of that, Your Honor. Let me ask you a question. This comes up from Mr. Judge DiNamorello. Where was this case tried? Where was this case tried? Where would this event occur? This raid? Where? It occurred in Collingsworth County. What city? Wellington, Texas. Wellington, Texas. And, and. And the jury that was dropped, that was from the Amarillo, Amarillo Court? Yes, that was the Amarillo division, Your Honor. I'm not a stranger to this country, but I just wouldn't understand. The jury was plainly not very persuaded with its award regarding the dog, shooting the dog. I, I accept the dogs, because not simply a terrible thing to wear a shoe, a dog unnecessarily, but, but, because it signals to me the lack of preparation of this officer. What, what is it? Does the record show anything about his employer, or what his background was at Police Academy, or, you know, in his training? Your Honor, I, I, I don't recall it off the top of my head, except I, I know he was TCO certified, based upon my recollection. I, I was not the trial counsel on this. I'm just trying to get a sense of where that would sit. He. Counsel, even if you were right that he had to show that, that they had to establish what a reasonable officer would do, doesn't his boss' testimony that the reasonable officer wouldn't have proceeded in that situation like that without the backup and all of that provide that information? With respect to the dog, no. But the whole incident of staying in the house after he's determined that they're not killing someone right then and, and that he's supposed to step out and that wait for the backup is what the boss said at the trial. I'm not saying that's the right thing to do. I'm just saying that's what the testimony is from the trial. Well, that's, Your Honor, I, I submit that second guessing. Looking back at this in 20-20 hindsight. Well, it's in the evidence at the trial. But. Which is what you said it was that they needed to say what a reasonable officer would do and I think nobody says his boss isn't a reasonable officer and he told him what the reasonable officer should do. Your Honor, I may, I may not recall what you're referring to specifically, but as I recall, Sheriff Riley, the only thing that he was asked that he remotely got to that was with respect to what he would do if he encountered, knew he was going to encounter a dog and that was using pepper spray. But before that, he said, oh, if you're on your own and you're going to domestic violence and then you determine it's not an, it's not right there where you have to shoot somebody because they're shooting someone else or something. He explains if it's not that emergency, you step out and you wait for your backup and then you come. This is Wellington, Texas. It's a real small community. The sheriff was on his way from Amarillo. Well, the sheriff's the one who said it, so I think he knows his community. I don't, I'm not trying to say he's right or wrong. I'm just saying it's in the record. Let's see. I'm out of time. Yes. Thank you. Mr. Mr. Thank you. First, I'd like to come back to judge. All right. You had asked for those case citations regarding dissipation. That was United States versus Davis to 90 F. Third, 1239 at 1244. It's a 10th. It's a 10th circuit case, but it was what was cited by the district court. Additionally, Hannon versus state. Another case cited by the district court. 125 Nevada, 142 at 207 or 207 Pacific third, 344 at 348. Another case cited by the district court. In this case to discuss the concept of dissipation as it applied to the facts of this case. When the district court gave the case to the jury on the question of qualified immunity, the district court stated what the plan is presented through chief Riley. But I do think there's enough meat on the bone in Riley's testimony, although implicit about his training and what officers do when they're dealing with aggressive dogs and the importance of avoidance. Also within the context of the trial, Mr. Killian testified, and this is record of appeal 22 dash one one zero six zero dot one six six zero by 19 through one six, six one line 12. When I asked him, did you write your report this way to make it appear that you were reasonable? That would allow the jury to infer if they decided that his report was not credible, that he knew his actions were unreasonable. Additionally, when the defendant's expert was cross-examined, this is record of appeal one one zero six zero dot one seven oh six, starting at line nine. It says that officers in the Brown case, which we've talked about to the jury were reasonable due to the totality of the circumstances, but he also conceded on cross-examination that the Brown case was wildly different from the facts in the Killian case. There was no growling, there was no barking, there was no warrant. It wasn't a drug house where people were suspected of selling cocaine and heroin. The dogs weren't aggressively jumping and so forth and so on. Upon that concession, that allows the jury to say the reasonable officer exists in Brown, but the facts of Brown don't exist here. So a reasonable officer doesn't exist here. Can you see the head banging? I can't remember. I'm sorry. Can you see the head banging? No. When Mr. Killian throws Mr. Ramirez to the floor by her hair, it disconnects the camera because of the tumultuous and violent-ness of it. And that is a interesting question because when Judge Smith wrote that the courts will consider not only the need for force, but the relationship between the need and the amount of force used, that reveals that no reasonable officer abruptly resorts to overwhelming physical force against an individual who does not pose an immediate threat of flight risk. If the force was abrupt, that's a jury question. Was the force overwhelming? Jury question. Was Ms. Ramirez an immediate threat, handcuffed behind her back, standing up off the couch, or at any point that she was pepper sprayed? These are all jury questions. Was she resisting passively, aggressively at all? Those are jury questions that should not have been dealt with on summary judgment. Further, there is the Brothers versus Zoss case, that's 37 F3rd and 513 Penn State 520, that's Fifth Circuit in 2016. One of the considerations is the speed to which the officer begins to use force and the speed to which the officer escalates that use of force. In this case, it's a jury question as to whether two seconds is enough to comply with an order before she's pepper sprayed. In this case, it's a jury question of whether getting up after things have dissipated, being thrown to the floor by your hair, is something that a reasonable officer would do based on the speed of the force used. Let me just ask you a question while you have only a minute left. At the conclusion of your brief, you say that we should overrule or clarify McCoy. Of course, we can't overrule it as a panel. It would have to go in bank. Explain what it is about McCoy that you think needs attention. Sure. McCoy, the particular language of McCoy, is citing a previous case, Snyder, which itself is citing another case here. I don't remember the name from 1989. The citation of McCoy says, if the issue of qualified immunity is not decided until trial, the defense is not waived but goes to the jury, which must determine the objective legal reasonableness of the officer's conduct. Period. Quotation mark. Citation of Snyder. When you go to Snyder, there is no period. There's an additional six words. Those six words, by construing the facts in dispute. Since McCoy cut off those six words, it's my understanding, that's why the district court thought that we had to put on affirmative evidence at trial as to what a reasonable officer would do. Okay. You answered that question. Thank you, Mr. Harris. Thank you. Your case is under submission.